**MINEMET, INC., Plaintiff,**

v.

**M. V. MORMACDRACO, her engines, boilers, etc., Moore-McCormack Lines, Incorporated and International Terminal Operating Corp., Defendants.**

**No. 81 Civ. 2366.**

United States District Court,
S. D. New York.

April 19, 1982.

Purrington & McConnell, New York City, for plaintiff; Stephen A. Agus, Richard E. Juzumas, Ellen Dowd Vitale, New York City, of counsel.

Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, New York City, for defendant Moore-McCormack Lines, Inc.; Peter J. Zambito, New York City, of counsel.

Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, New York City, for defendant International Terminal Operating Corp.; George W. Clarke, Robert E. Daley, Robert J. Ryniker, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This action centers about the theft from a pier in Brooklyn, New York of 70 bundles of tin ingots weighing 35,000 kilograms that were in two "pier-to-pier" shipping containers.

Plaintiff, Minemet Inc. ("Minemet"), was the purchaser and the consignee of the tin ingots which had been transported from Santos, Brazil aboard the M.V. Mormacdraco owned by the Moore-McCormack Lines ("Mormac") and discharged at the 23rd Street Terminal in Brooklyn, New York. The Terminal encompassed a number of adjacent piers, one at 25th Street and another at 23rd Street. Mormac operated and controlled the piers at the Terminal and provided all security for the piers and the cargo stored there, including gatemen and security guards.

International Terminal Operating Corp. ("ITO"), pursuant to a contract with Mormac, provided stevedoring services customarily performed by a terminal operator which included discharging cargo from the vessels, storing and stripping containers and delivery of cargo. ITO discharged and placed cargo onto the piers in consultation with Mormac.

Minemet seeks recovery for nondelivery of the stolen shipment valued at $581,653.27 plus the freight of $7,028 from the vessel and Mormac as the carrier (collectively Mormac) and from ITO for their alleged negligence while the containers were in their custody. Minemet and Mormac agree that if Mormac is liable to plaintiff, its liability is limited to $35,000 based upon the $500 per package limitation (70 bundles at $500 each) contained in the Carriage of Goods by Sea Act,[1] the Harter Act,[2] and the bill of lading issued by Mormac. Minemet contends that ITO is not entitled to the

$500 per package limitation since it was not a party to the bill of lading. Thus plaintiff seeks the major portion of its claimed loss from ITO.

Mormac denies any negligent conduct with respect to the shipment while in its custody and in addition to affirmative defenses asserts, in the event it is held liable to Minemet, a cross-claim against ITO for indemnity upon the ground the loss was due solely to ITO's (1) negligence and (2) breach of its warranty of workmanlike performance under the terms of their agreement.

ITO, with respect to Minemet's claims against it, denies it was a bailee of the shipment; also, it denies any negligence on its part. As to Mormac's cross-claim it pleads contributory negligence by Mormac as a defense; in addition, it alleges a cross-claim against Mormac on the ground that the loss of the cargo was due to Mormac's failure to provide adequate security at the pier and that if it, ITO, be found negligent, it was passive. Finally, ITO contends that if it is found liable to plaintiff, it also is entitled to the $500 per package limitation under the Carriage of Goods by Sea Act and the bill of lading;[3] or, alternatively, the $500 per package limitation contained in the Port of New York Marine Terminal tariff.

Before discussing the operative facts which are common to the various claims and cross-claims, it is desirable to state the applicable law. Plaintiff's claim against Mormac, the carrier, is within the admiralty and maritime jurisdiction of the Court. The standard for determining its liability is under federal law. Thus, following the discharge of the containers from the vessel, Mormac continued as bailee under the contract of carriage and as such remained liable for the safe delivery of the ingots to the consignee regardless of the fact that it had engaged ITO to render stevedoring services at the pier with respect to the shipment.

---

1. 46 U.S.C. § 1304(5).

2. 46 U.S.C. §§ 190–196.

3. *But see Robert C. Herd & Co. v. Karwill Machinery Corp.*, 359 U.S. 297, 302–03, 79 S.Ct. 766, 769–70, 3 L.Ed.2d 820 (1959).

Plaintiff, as bailor, makes out a prima facie case of negligence upon proof of delivery of goods to Mormac and its failure to redeliver at the required time. The burden of production then shifts to Mormac to come forward to show that the loss in no way was attributable to its negligence or that it exercised the requisite degree of care with respect to the bailed shipment.[4] Thus in this case, Mormac may meet its burden of production by showing that the loss was due to theft and that the theft was not the result of its negligence.[5]

■ Plaintiff's case against ITO is governed by different standards. The claims against ITO are based upon common law liability for tortious conduct under the law of New York and jurisdiction is pendent.[6] It also seeks to hold ITO liable as a bailee even though it was not a party to the bill of lading. As noted, ITO provided its terminal and stevedoring services to Mormac at the pier upon the discharge of the containers from the vessel. In this capacity, ITO was an agent "engaged in fulfilling [Mormac's] obligations following discharge of the containers, apparently occupied as well the status of a bailee with respect to the shipper (citing New York State cases)." [7] However, state law differs from federal law as to the burden of production upon ITO as bailee once the bailor makes out a prima facie case by proof of nondelivery. New York holds that the "bailee is not required to go on to show that the theft was not the result of its negligence; rather it is for the bailor to demonstrate negligence on the part of the bailee in the context of loss by theft (citing New York cases)." [8]

Upon the trial, Minemet made out its prima facie case by showing delivery of the goods to Mormac and the failure to return at the required time; it also established as part of its direct case the theft of the shipment and other attendant circumstances related thereto. Thus the principal testimony upon the trial centered about the issue of negligence on the part of Mormac, the carrier, and ITO, the stevedore.

It is desirable to describe the general procedure that was in effect at the time in question with respect to pier-to-pier containers that had valuable or special cargo and the activities of each defendant with respect thereto. Prior to a vessel's arrival at the port, Mormac notified ITO of special cargoes that were to be placed in a security position upon their outturn pending their removal by the consignee. Upon unloading onto the pier, they were stacked in twos—that is, one container placed on top of the other and close to adjacent containers so that their doors could not be opened. The purpose was to prevent theft or pilferage from the containers but this would not prevent theft of an entire container with its contents. The containers were kept in this stacked condition until they were ready to be stripped or "unstuffed." [9]

Usually stripping is effected within two days after complete discharge of the unloading vessel's cargo. However, this may be delayed depending upon the number of vessels being loaded or unloaded, pier congestion, available stevedores, and other factors. When ready for stripping, the containers are placed on a chassis and removed by tractor to a headhouse at the 23rd Street pier where the contents of the containers

---

4. *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 812 (2d Cir. 1971).

5. *Id.* at 812–13; *David Crystal, Inc. v. Cunard Steam-Ship Co., Ltd.*, 339 F.2d 295, 298 (2d Cir. 1964).

6. *United Mineworkers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Schiess-Froriep Corp. v. S.S. Finnsailor*, 574 F.2d 123, 124 n.2 (2d Cir. 1978).

7. *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 813 (2d Cir. 1971); *see Stein Hall &*

*Co. v. S.S. Concordia Viking*, 494 F.2d 287, 290 (2d Cir. 1974).

8. *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 814 (2d Cir. 1971); *I.C.C. Metals, Inc. v. Municipal Warehouse Co.*, 50 N.Y.2d 657, 431 N.Y.S.2d 372, 409 N.E.2d 849 (1980).

9. The container is "stuffed" or loaded at the port of origin and upon discharge at the port of outturn is "unstuffed" or "stripped" by the stevedore for ultimate delivery of its contents to the consignee.

are unloaded and placed in cribs (secured areas) until called for by the consignee or its trucker. To move containers from their resting place following their discharge to the pier, or from one place to another on the pier, specialized equipment is required such as a top loader, or a stacker (a heavy forklift), which lifts the container and places it on a chassis which is connected to a tractor. The specialized and heavy equipment and other machinery for stacking and moving containers were under the control of and used by ITO personnel.

The entire terminal was enclosed by a cyclone-wire fence 8–10 feet high topped with barbed wire, and a Mormac guard was stationed at each gate entrance to a pier. Only authorized ITO and Mormac employees were admitted to the piers to carry out their assigned tasks and other persons had to identify themselves as having legitimate business to be admitted to the pier areas. Against that background, the Court turns to the events touching upon the two containers in question.

Mormac, prior to the vessel's arrival at the 23rd Street Terminal, had notified ITO of the containers and their ingot contents. They were discharged from the vessel on Wednesday, January 16, 1980 onto the open 25th Street pier and were stacked one over the other and blocked by other containers so that the doors could not be opened. The containers rested flat on the pier and could not be moved unless first placed on a chassis. The unloading of the M.V. Mormacdraco was completed by 2:30 p. m. on January 17, 1980.

Mormac's security guards regularly checked all containerized cargo on the pier. The guards worked on three eight-hour shifts. The duties on their rounds included recording on a "Daily Container Report" the identification number of each container, its seal number, its lock or cable number and whether the container was stacked and blocked. On January 18, 1980, Emilio Pace, a pier guard on the 3–11 p. m. shift, started his inspection at the waterside-end of the pier working his way inland toward the gate at 25th Street. He listed on page 2 of his container report the numbers of the two containers here at issue; also that they were stacked one upon the other and blocked door-to-door; in that position, he could not read the seal or lock numbers of the stacked containers and so they were not recorded. Pace's entry reflects that the two containers were in their secured condition as originally positioned upon their outturn. Pace continued his recording of container information working his way forward. At about 5:00 p. m., he listed on page 5 of his report two containers the numbers of which corresponded to those referred to above and, in addition, since these containers were no longer blocked and stacked, he was able to see and so record the lock numbers. It is apparent that sometime before 5:00 p. m. both containers had been moved inland closer to the 25th Street gate-end of the pier. Many other containers had also been moved from their original positions during the 7:00 a. m. to 3:00 p. m. shift. The day was a busy one at the pier with three vessels loading and unloading and many longshoremen on the pier using stackers, high-lows and other machinery. Pace had stopped listing containers at about 5:00 p. m. because of heavy rain but continued his duty as watchman at the gate entrance.

Although Pace's tour of duty ended at 11:00 p. m., he left the 25th Street area a few minutes before and proceeded to the 23rd Street gate to sign out. Before doing so, he locked the gate leading to the 25th Street area with a cable and seal. During Pace's tour of duty, no unauthorized persons or trucks entered through the 25th Street gate. All ITO personnel had left the pier by 6:00 p. m. and none were present or on duty in the pier area at the time of the kidnapping and theft referred to hereafter.

Rene Tadros, a pier guard who was to relieve Pace and had the 11:00 p. m. to 7:00 a. m. tour, checked in at the 23rd Street gate at 11:02 on the evening of January 18 and proceeded to the 25th Street gate to start his tour of duty. When he arrived there a few minutes later, he was surprised by two men who held him at gunpoint and

obtained keys for the gate; they cut the seal and cable and opened the gate. A car driven by a third person pulled up from outside the gate and Tadros was placed in the car, told to close his eyes, was handcuffed and driven around for a period. It is unknown how many others participated in the crime. At about 3:00 a. m., January 19, he was released and handcuffed to a car in Queens, Long Island where soon thereafter he was found by the police and released.

When Tadros failed to telephone on the hour to the 23rd Street guardhouse as required, a search was instituted for him and the 25th Street gate was found open. After an unsuccessful search for Tadros, Mormac's Chief of Security was notified and upon arrival at the pier reviewed the manifests and determined that the subject containers were missing. The parties have stipulated they were stolen from the pier between 11:00 p. m. January 18 and 12:20 a. m. January 19, 1980. Several weeks later one empty container was recovered in Jersey City, New Jersey and several days later the other, also empty, was found in Newark, New Jersey. After investigations by the Federal Bureau of Investigation and other authorities no persons have been charged with the crime.

Upon a review of the entire record, a word-by-word study of the trial transcript, my own trial notes and comments, an evaluation of the demeanor of witnesses as each testified, and after consideration of the respective burdens as enumerated in the comprehensive *Leather's Best Inc. v. S.S. Mormaclynx*,[10] the Court finds that plaintiff has failed to carry its burden of persuasion.

■ The Court considers plaintiff's claims against each defendant separately. As to Mormac, plaintiff contends that it failed to provide adequate security while the containers were on the pier awaiting stripping. However, the evidence establishes that under Mormac's instructions as to the nature of the containers, ITO stacked them one on top of the other and close to other containers to prevent pilferage until they were ready to be unstuffed and their contents removed to the crib area. Plaintiff contends, however, that it was negligent conduct for Pace, Mormac's security pier guard to leave the area a few minutes before he was to be relieved by Tadros—that somehow, just how is not explained, had he waited to meet Tadros, his relief, it would have avoided the kidnapping of Tadros and prevented the armed men from getting the key from Tadros, unlocking the gate and thereby the theft would have been prevented. It is evident that the robbers and their associates were engaged on a deliberate mission and it is highly speculative that Pace's presence together with Tadros would have made the slightest difference in thwarting the robbery. Indeed, plaintiff's counsel acknowledged that his conceptualization was "highly speculative."[11]

Plaintiff makes the further claim against Mormac that when Pace recorded the same numbers for two containers for a second time and in a different location where they were not stacked and blocked, he should have been alerted that something was amiss and forthwith have notified his superiors and in turn they should have detected the change in location long before Tadros started his tour of duty and thus "the theft would have been prevented."[12] This theory of alleged negligence assumes that in the process of noting numbers of six or seven digits on more than 200 containers that Pace would have recognized that he had recorded the same container numbers on two separate occasions and in two locations. This claim is as highly speculative as that advanced with respect to the lapse of a few minutes during the shift of the pier guards.

Plaintiff contends that if it does not prevail on these direct claims Mormac may be held liable for the negligent acts and conduct attributable to ITO as its stevedoring

---

**10.** 451 F.2d 800 (2d Cir. 1971).

**11.** Trial Record (hereafter T.R.) at 662.

**12.** T.R. at 661.

agent in the handling of the containers.[13] ITO was under a common law duty to handle the cargo with due care and would be liable for all damages caused by its negligence.[14] Thus the Court considers the charge that ITO failed to measure up to its duty to exercise reasonable care under all the attendant circumstances and upon which it is sought to hold both defendants liable.

Generally, plaintiff makes a broadside charge that the theft was an "inside" job either perpetrated or participated in by ITO's personnel. This blunderbuss charge, regardless of whatever suspicions the theft may have engendered, is without factual support on this record. Whatever the true state of occurrence, no fact, direct or circumstantial, permits a reasonable inference that ITO employees played a role in the kidnapping or the theft. The evidence is undisputed that all ITO activity ceased and all ITO personnel departed from the 25th Street pier by 6:00 p. m. and, consequently, no act or conduct occurring thereafter could be attributed to ITO.

Plaintiff, however, specifies two items occurring prior to 6:00 p. m. to establish ITO's negligent conduct. It contends that since the containers at issue had valuable tin cargo which was known to ITO (as it was known to Mormac), the containers should have been stripped either on the very day of their outturn, January 16, or by the next day, January 17, and the contents stored in the 23rd Street secure crib area. But the usual period for stripping, even as to special and valuable cargo, and there is no disagreement as to this, is two days after a vessel has been completely discharged of all its cargo—and even this is not a fixed period but is subject to a number of factors as already noted. Plaintiff argues that while this may be the general rule, in the instant case it points out that on January 16, 11 containers that were unloaded from the Mormacdraco were stripped and that on the

17th and 18th, another 11 containers were stripped. In this circumstance, it contends that the subject containers with their far more valuable contents should have been removed from the pier and stripped forthwith upon outturn—in short, that its shipment should have received priority over other cargo. However, this contention, clearly a hindsight judgment, ignores actual conditions at the pier at the time and place of occurrence. The Mormacdraco was not finally discharged of its cargo until 2:30 p. m. on January 17. Thus from that time until the theft, between 11:00 p. m. on January 18 and 12:20 a. m. on January 19, less than a day and a half had elapsed. During this period there were more than 200 containers on the 25th Street pier, some were from vessels that had unloaded cargo and were awaiting pick up by their consignees, or waiting to be moved and stripped, and still others were containers being loaded onto outgoing vessels. During this activity, plaintiff's containers were in a secured position and protected against pilferage and theft. There was no reason to accelerate the usual two-day period before removal for stripping. As to those containers that were stripped previously, some contained highly pilferable cargo which clearly justified their earlier removal. Under all the circumstances, it cannot be said that there was undue delay or that ITO was negligent in not stripping the two containers prior to the holdup and robbery.

Plaintiff makes a final argument that a fair inference is that ITO personnel moved the containers closer to the front gate and placed them on chassis prior to 5:00 p. m. so that they were ready for removal and all the thieves had to do was to hook up a tractor and haul the containers away. For support, plaintiff rests on the change in position of the containers as reported by Pace and that it is unreasonable to assume that the thieves used the ITO equipment because, following the theft, all equipment

13. See Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800, 812 (2d Cir. 1971).

14. Robert C. Herd & Co. v. Karwill Machinery Corp., 359 U.S. 297, 303, 79 S.Ct. 766, 770, 3

L.Ed.2d 820 (1959); Stein Hall & Co. v. S. S. Concordia Viking, 494 F.2d 287, 290 (2d Cir. 1974); Demsey & Associates v. S.S. Sea Star, 461 F.2d 1009, 1016 (2d Cir. 1972).

was found where it had been parked by ITO personnel at the conclusion of work the day before.

Plaintiff's theory of the crime is a giant step which rests on inference upon inference and is not supported by the record. Plaintiff's reconstruction of the no-witness crime leads into the realm of surmise and conjecture.

The evidence does not establish that the containers were on chassis when Pace noted their numbers a second time at 5:00 p. m. To the contrary, the evidence shows that all containers, except those containing dangerous cargo which were specially segregated, were kept off chassis and were resting on the floor of the pier. Since it would be highly unusual for containers to be stored on chassis, Pace's report is notable for its failure to include under the remarks column any statement that the containers were on chassis. Moreover, there is no basis upon which to rule out that the containers had been moved by ITO personnel toward the 25th Street gate to make way for other containers in view of the congestion on the pier; many containers had been moved from spot-to-spot on that day. In addition, there is no basis for ruling out that the thieves in the period between 11:00 p. m. on January 18 and 12:20 a. m. on January 19 had themselves brought in chassis and used available equipment on the pier and made their getaway with the containers. There was more than ample time for the robbers to have used a nearby top loader and placed the containers on chassis. The top loader was plugged into a heater on the 25th Street pier so that it could readily be started in the wintertime. Thus it was available to any outsider who gained entrance.

The plaintiff's theory would require ITO to maintain constant surveillance of each item of special cargo as the test of reasonable conduct for its care and safety while ITO was engaged in its normal stevedoring duties. This in effect would make it an insurer of the cargo against loss. ITO under its contract with Mormac was not engaged to maintain security or surveillance over the cargo; it was required to perform customary terminal and stevedoring services. In the performance of its task and its correlative duty to plaintiff, it was required to exercise reasonable and prudent care under all the circumstances. Measured by this standard, it cannot be said that any act or failure to act of ITO was negligent conduct, or, even so, that but for such negligence the theft would not have occurred.[15]

Apart from lack of proof of negligence, a fact that will not down is that the armed robbery and kidnapping of the pier guard, the type here perpetrated, was not a foreseeable act. No robbery had occurred at the Terminal in more than ten years. Certainly this type of crime is not so common that it should have been anticipated by either defendant. Anticipating pilferage from containers on piers is one thing; anticipating armed robbery and kidnapping to steal containers is something else. While "pilferage of cargo is endemic at piers,"[16] kidnapping and armed robbery of a container from a protected pier is a rarity. There is no rational basis upon which a finding can be made that it was a foreseeable act in light of all the attendant circumstances.[17]

During the argument at trial on defendants' motion to dismiss at the close of the plaintiff's case, the Court then expressed the view, although reserving decision on defendants' motion, that to accept plaintiff's theories "one has to grope and guess and conjecture."[18] Following the trial, further close study of this entire record reaffirms this view. A finding of fact may not

---

**15.** *Cf. Union Marine & General Ins. Co. v. American Export Lines*, 274 F.Supp. 123, 129 (S.D.N.Y.1966).

**16.** *Arbeeny v. McRoberts Protective Agency*, 642 F.2d 672, 675 (2d Cir. 1981).

**17.** *Saugerties Bank v. Delaware & Hudson Co.*, 236 N.Y. 425, 430, 141 N.E. 904 (1923); *Laidlaw v. Sage*, 158 N.Y. 73, 52 N.E. 679 (1899); *see also Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 519, 429 N.Y.S.2d 606, 613, 407 N.E.2d 451, 457 (1980).

**18.** T.R. at 471.

be based on guess.[19] In short, the plaintiff has not sustained its burden of persuasion by a fair preponderance of the evidence. The Court is not persuaded that plaintiff's contention as to how the loss occurred was more likely than not.[20]

Judgment may be entered in favor of the defendants dismissing the complaint upon the merits. This disposition makes it unnecessary to consider the respective cross-claims.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law.

---

**19.** *See In re Knetzer*, 229 F.2d 232, 237 (7th Cir. 1956); *see also Universe Tankships v. Pyrate Tank Cleaners*, 152 F.Supp. 903, 920 (S.D. N.Y.1957).

**20.** *In re Winship*, 397 U.S. 358, 371, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1979) (Harlan, J., concurring); *United States v. Masiello*, 235 F.2d 279, 286 (2d Cir. 1956) (Frank J., concurring), *cert. denied*, 352 U.S. 882, 77 S.Ct. 100, 1 L.Ed.2d 79 (1957).