**R.B.K. ARGENTINA S.A., Plaintiff,**

**v.**

**M/V DR. JUAN B. ALBERDI, her engines, etc., in rem, Empresa Lineas Maritimas Argentina S.A. (E.L.M.A.), Christian F. Ahrenkiel G.M.B.H. & Co., Aquitania, Beteliligungs Gesellschaft Navifonds Nr. 25 M.B.H. & Co. KG and Universal Maritime Service Corporation, in personam, Defendants.**

No. 93 Civ. 6706 (BN).

United States District Court,
S.D. New York.

July 23, 1996.

---

Hill Rivkins Loesberg O'Brien Mulroy & Hayden, New York City (Keith B. Dalen, of counsel), for Plaintiff.

Kirlin, Cambell & Keating, New York City (J. Scot Provan, Robert A. Milana, of counsel), for defendant Empresa Lineas Maritimas Argentinas S.A. (E.L.M.A.).

Marcigliano & Campise, New York City (Frank M. Marcigliano, Eileen D. Stier, of counsel), for Defendant Universal Maritime Service Corporation.

### OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge: [1]

R.B.K. Argentina S.A. ("plaintiff") brings this action grounded in Admiralty against Empresa Lineas Maritimas Argentinas S.A. ("ELMA") and Universal Maritime Service Corporation ("Universal"). Plaintiff seeks money damages of $311,733.21 as compensation for losses sustained respecting a shipment of sport shoes. The shoes were received by ELMA in Boston, transported by truck to New York, where they were stored by Universal, and thereafter loaded by ELMA on board the M/V Dr. Juan B. Alberdi for transport to Buenos Aires, for pick-up by plaintiff. After the shipment arrived in Argentina, plaintiff alleges that a large amount of the shoes were discovered to be missing. Both defendants, ELMA and Universal, deny any liability for the lost shoes. This matter arises under the court's jurisdiction, pursuant to 28 U.S.C. § 1333.

The case was tried to the court in a five day bench trial. In conformity with F.R.C.P. Rule 52(a), the following constitutes the court's findings of fact and conclusions of law.

### THE RECORD

Plaintiff presented three witnesses: Alejandro Guerrico, a customhouse broker for a Customs Dispatch Company in Argentina; Steven Stanford, operations manager for Kellaway Transportation Inc.; and David Sinclair, President of Theodore D. Helprin, Inc., a cargo surveying company. ELMA presented three witnesses: Carlos Lesmi, an expert in Argentine law; Jose Gussoni, a customs agent and lawyer in Argentina; and Captain Ariel G. Canzani, the United States Supervisor for ELMA. Universal presented one witness: Ray Richards, the cargo claims supervisor for Universal Maritime. Pursuant to agreement by counsel and F.R.C.P. Rule 32(a)(3)(E), the depositions of Jose Diaz, a customs verifier for Argentine Customs; Frederick D. Carter Jr., dispatcher for Ideal Transportation; Philip A. Puopolo, a truck driver; Marcelo Fernando Scarone, the General Manager of R.B.K. Argentina; and Edward James St. John, a driver for Ideal, were admitted into evidence. The parties moved 113 exhibits into evidence.

### CONTENTIONS OF THE PARTIES

Plaintiff contends that on August 28, 1992 a container of 736 cartons of sport shoes were delivered to ELMA in Massachusetts. At that time a seal, which had been previously placed on the container by plaintiff, was intact. After receiving the container, ELMA transported it by truck to a New York shipping terminal run by Universal. While at Universal's terminal, the container and its contents were determined to weigh approximately 17,000 pounds. After being stored in Universal's warehouse for several days, the container was then loaded aboard the ship, M/V Dr. Juan Alberdi, and was transported to Buenos Aires, Argentina.

On September 26, 1992 one day after the M/V Dr. Juan B. Alberdi arrived in Argentina, plaintiff maintains that possession of the container was taken by its customshouse broker, Alejandro Guerrico. According to plain-

---

**1.** Bernard Newman, Senior Judge of the United States Court of International Trade, sitting as United States District Judge by designation.

tiff, approximately two hours after it had custody of the container, it was opened. Despite Guerrico's observations as to the apparent structural integrity of the container as well as good condition of the three seals affixed to it, plaintiff asserts that approximately two-thirds of the cartons of shoes were discovered missing when the container was opened. According to plaintiff, Guerrico immediately contacted by phone the plaintiff's insurance representatives. Plaintiff also contends that Guerrico orally advised ELMA of the shortage on the day that it was discovered. Although plaintiff did not have the container weighed upon its arrival in Argentina, on October 2, 1992 Argentine Customs officials determined the weight of the remaining cargo to be 3990.76 pounds.

In advancing its argument as to the applicable law governing this matter, plaintiff states that this case falls under the United States Carriage of Goods by Sea Act, 46 U.S.C. § 1300 *et seq.* ("COGSA"). COGSA provides that after the plaintiff establishes a *prima facie* case against the defendant carrier by proving receipt of goods by the defendant in good order, and demonstrating that upon their outturn the goods were damaged, the burden of proof then shifts to the defendant. Consequently, argues plaintiff, since it has made a *prima facie* showing that it delivered the shoes to ELMA in good order and there were cartons missing when ELMA returned the container to plaintiff, ELMA and Universal bear the burden of demonstrating that they did not cause the loss.

Therefore, plaintiff insists, since ELMA and Universal are unable to explain the loss of shoes, they are liable for the lost merchandise. Plaintiff also contends that its damages are the fair market value of the shoes, $312,186.89. Moreover, plaintiff seeks recovery of $10,875 paid for additional security, upon discovery of the missing cargo. Finally, plaintiff asserts that it is entitled to $7,020 it paid in freight and insurance.

ELMA and Universal dispute that COGSA is the applicable law governing this case. ELMA suggests that the law of Argentina applies after the cargo was discharged. Moreover, ELMA argues that since plaintiff did not comply with Argentine legal requirements, it cannot now recover. Finally, ELMA maintains that even under COGSA, plaintiff has failed to establish a *prima facie* case. With respect to any claims plaintiff has against Universal, since Universal characterizes this action as one against a stevedore for negligent loss of cargo, it maintains that such a claim is not within federal maritime jurisdiction but is a state claim governed by New York State bailment law.

ELMA argues that plaintiff has failed to submit any credible evidence to demonstrate that ELMA was at fault for the shortage. In advancing its claim, ELMA points out that Guerrico, plaintiff's only fact witness regarding the loss, admitted to lying in his deposition by stating that all of the seals were intact when the container was delivered to plaintiff in Argentina, that there were no independent custom brokers present when the cargo was being counted after delivery in Argentina, that the container was stored in an inaccessible position on the ship while being transported and that there was no record of notice given to ELMA or even plaintiff with respect to the loss until several days after Guerrico discovered the loss. Continuing, ELMA points out that there was at least 45 minutes during which the plaintiff had possession of the container and did not submit any evidence regarding its status during that time period. Consequently, ELMA concludes that plaintiff has failed to eliminate the possibility that the loss occurred while in the plaintiff's possession or demonstrate that ELMA was in any way responsible for the cargo shortage.

Universal argues that as a bailor, it need not establish that it was free from negligence. Rather, Universal insists that it is plaintiff who bears the burden to establish that there was negligent conduct on the part of Universal which contributed to the loss of the shoes. Universal states that there is not a shred of evidence demonstrating that any loss of plaintiff's cargo occurred while the container was in Universal's care. Accordingly, Universal maintains that plaintiff has failed to establish a valid claim. Alternatively, Universal argues that even if the court were to find that plaintiff had established a *prima facie* case against it, plaintiff's recov-

ery is limited to damages as provided by COGSA. By virtue of a clause in the contract of carriage between ELMA and plaintiff which extends COGSA's liability provision to ELMA's stevedore, Universal can assert rights under COGSA regarding liability against plaintiff.

Lastly, Universal contends that ELMA cannot maintain a valid cross-claim for indemnification. Universal advances two arguments in support of its position. First, the contract between Universal and. ELMA requires that Universal receive notice of any claim brought against Universal within one year of the time in which Universal surrendered the shipment to ELMA. In this case, since it is undisputed that ELMA regained control of the cargo from Universal on September 5, 1992, ELMA's failure to notify Universal prior to September 5, 1993 of the claim, renders any attempt to force indemnity from Universal, time barred. Secondly, as previously noted, Universal maintains that since there is no evidence to establish that Universal's negligence contributed to the loss, ELMA cannot establish a valid claim for indemnity against Universal.

### FINDINGS OF FACT

Plaintiff is a distributor of sport shoes. Defendant ELMA, the owner of the M/V Dr. Juan Alberdi, was at all pertinent times engaged in the business of common carrier of merchandise by water for hire. Defendant Universal in September 1992 operated Red Hook Terminal in Brooklyn, N.Y. and was engaged in the business of stevedoring on behalf of various ocean carriers including co-defendant ELMA.

In June 1992, plaintiff ordered certain styles of sneakers from Reebok International, LTD for delivery to Buenos Aires, Argentina. Thereupon, plaintiff entered into a charter with ELMA to transport the shoes from Massachusetts to Buenos Aires. On August 26, 1992 at the Kellaway Warehouse in Brockton Massachusetts, 736 cartons of sport shoes were loaded into a container bearing the identification number TRIU 4246320 ("the container"). The loading of the container was supervised by Steven Stanford, manager of Kellaway Warehouse.

Upon completion of the loading, a seal bearing number 024734 was placed upon the container. Kellaway did not compile a packing list with respect to the container's cargo, nor was the weight of the shipment recorded. Nevertheless, Sanford represented to the court that the cargo had a weight of 16,890 pounds. On August 28, 1992 the container was delivered to ELMA at the J.F. Moran Terminal at Charleston, Massachusetts. It is undisputed that seal number 024734 was intact when ELMA received the container. ELMA transported the container by truck from Charleston, Massachusetts to Red Hook terminal located in Brooklyn, New York. At that point, custody of the cargo was assumed by Universal.

After the container was received by Universal at Red Hook, the container, its contents, the chassis and the tractor were weighed and found to have a total weight of 49,880 pounds. At the time the container was delivered to Universal, an ELMA seal bearing the number 000317 was affixed to the container. ELMA's driver, Phillip Puopolo, verified the secure placement of ELMA's seal. The container was placed in "area N" of the Red Hook facility, where it remained until September 5, 1992 when it was loaded aboard the ship M/V Dr. Juan Alberdi. There is no dispute that both seals were intact when Universal returned the container to the custody of ELMA aboard the vessel. At that time, ELMA issued an "on board" bill of lading covering the transportation of the container to Buenos Aires (Exh. 50). The stated weight of the cargo as documented by the bill of lading was 16,890 pounds.

Having been loaded aboard the ship, the container was stored in Cargo Bay 17, in the fifth tier from the bottom of the hold. In this position the container was approximately 32–40 feet above the ship's deck. Before arriving in Argentina, the vessel made stops in Savanna, Miami and Santos. Since all of the cargo that was stored in Bay 17 was bound for Buenos Aires, none of the containers were disturbed prior to reaching Buenos Aires. Hence, the container remained unmoved in its tier until the ship arrived in Argentina.

On September 25, 1992 the vessel arrived at the Port of Buenos Aires. The container was discharged from the ship on September 26th and placed on the dock at Pier D. At that point in time, it is undisputed that both the shipper's seal as well as ELMA's seal were intact. In addition, a seal from Argentine Customs was placed on the container when it was discharged from the vessel. The container remained in the custody of ELMA at Pier D until September 29th. On that date, Alejandro Guerrico, a customshouse broker acting on behalf of plaintiff, went to Pier D in order to retrieve plaintiff's cargo.

At approximately 1 p.m., Guerrico submitted all the necessary documentation, including ELMA's authorization for release of the cargo, to Customs officials so that he would be able to take possession of the container on behalf of plaintiff. After determining that the papers were in order, Guerrico was sent by Customs to the location at Pier D where plaintiff's cargo was stored. Guerrico arrived at the location accompanied by two armed guards who were hired by plaintiff, the driver of the truck which was to transport the container, and a representative of ELMA. Guerrico examined the numbers of the seals which were affixed to the container and compared them to those listed on the bill of lading to ensure that the cargo was in fact plaintiff's. Several times during the course of the trial, Guerrico testified that at the time he received possession of the container, the seals were intact (R. 88–89). Guerrico further stated that although he checked the condition of the container, he observed no evidence of tampering (R. 89–90). After testifying that the doors of the container were not damaged, that there did not appear to be any holes in the container, nor was there evidence of "freshly welded spots," Guerrico

summarized: he "didn't see anything that caught [Guerrico's] attention. I didn't see anything out of the ordinary" (R. 126).

The container was placed on the truck by the ELMA representative and at approximately 2:30 [2], the truck loaded with plaintiff's cargo went to Pier A. Guerrico drove separately to Pier A in his own car, while the truck driver and two guards rode to the destination in the truck. The purpose for moving the cargo to Pier A was that the container could be opened in the presence of a customs verification officer and the actual merchandise could be compared to the listing on the manifest.

According to Guerrico, he arrived at Pier A ahead of the truck between 3:15 and 3:30 p.m. The truck bearing the cargo appeared soon after, and Guerrico proceeded to the Customs Office to see Lucas Diaz, the verifier for Argentine Customs. Guerrico stated that he had to wait between fifteen minutes and a half-hour before he saw Diaz. Guerrico testified at trial that Diaz took the documents and told Guerrico to help open the container. Although the container was supposed to be opened in the presence of a verifier, Diaz did not accompany Guerrico outside to the cargo and was not present when the container was opened.[3] According to Guerrico's trial testimony, notwithstanding the absence of a verifier, a laborer for the port cut the seals in the presence of Guerrico, the truck driver, the two guards, and a sailor from the Argentina Navy, which oversees the port. After the container was opened, Guerrico stated that three-fourths of the cartons of shoes were missing from the container.[4]

Guerrico returned to the building and told Diaz that there were many boxes missing

**2.** Guerrico's testimony was not specific with respect to the timing of the events. He testified that he accepted delivery of the container from ELMA between 2:00 and 2:30 p.m. and that the container was actually transported from Pier D to Pier A between 2:30 and 3:00 p.m. (R. 20, 87).

**3.** Guerrico admitted in his deposition, taken on May 26–27, 1994, that he testified untruthfully that Diaz had been present at the time the seals were cut (R. 30, 70). Guerrico explained that Diaz was an acquaintance of his grandfather, father, uncle, and was close to retirement (R.

28). At trial, Guerrico testified that Diaz "should have been present because his office—the window of his office is directly in front of where the seals were cut, but he didn't come out of his office" (R. 30). Explaining his lie, Guerrico told the court that "since I knew him [Diaz] for so long, I didn't want to harm him by saying that he had not been doing something that he was supposed to do" (R. 30–31).

**4.** Only Guerrico's testimony was offered to recount the opening of the container.

from the container. Diaz, who was distressed that he already signed the "Despacho de Importacion [5]," told Guerrico "that in order for him not to have problems, we would have to redo the last page of the dispatch receipt" (R. 33). The next day Guerrico, at the behest of Diaz, obtained a blank page and the verification part of the dispatch was once again filled out, this time the information regarding the shortage was included. Although the opening of the container was never verified, another Customs official signed the new page. The new page did not record any shortage, despite the signature of the verifier.

After he had told Diaz of the shortage on September 29th, Guerrico called his office and claimed to have informed "the insurance inspector" of the loss at approximately 4:30 p.m. (R. 40). While he was waiting for the insurance agent to arrive, Guerrico informed Mr. Biondi and Captain Delatorre of ELMA about the missing cartons of shoes. Although Guerrico testified that he spoke with representatives of ELMA regarding the cargo shortage, there was no written correspondence with ELMA until October 6th (R. 97). Fifteen minutes after Guerrico's call to the insurance inspector, a representative from plaintiff's insurance underwriters arrived at the port and took pictures of the open container (Exh. 9). Diaz told Guerrico that because it was getting late, nothing more could be done that day and the container would have to be moved back to Pier D. Guerrico, the insurance inspector, and the guards arrived at Pier D approximately 5:45 p.m. Guerrico was then told by the Pier chief that the container would necessarily remain overnight. An approximate count of the cartons in the container was taken, and it was determined that approximately 250 cartons re-

mained. After the rough count, Mr. Fernandez, the Customs guard, put a new seal on the container and it was taken to Pier B. According to Guerrico, the container was under the control of the Customs guards and private security guards hired by plaintiff, while it remained at the port.

At trial, Guerrico testified that he met with representatives of ELMA on October 1 and discussed the shortage [6]. The next day, October 2, at the request of the insurance company, the container was weighed by Argentine customs officials and the remaining cartons were counted in the presence of a notary public. The aggregate weight of the container and remaining cartons was 5690 kilograms (Exh. 12). The official count of the cartons revealed that there were 238 cartons of shoes inside of the container. Plaintiff took actual custody and control of the container on October 14th. Guerrico testified that from the morning of September 27 to October 14th he saw the container everyday and went to the port to sign a form requesting that it remain under customs guard. Essentially, a total of 498 cartons of shoes were missing from the original shipment.

Plaintiff did not seek a judicial survey in Argentina. However, on October 5, 1992 David Sinclair, a cargo surveyor, received notification from plaintiff hiring him to investigate the loss of the cargo. Sinclair was not asked to travel to Argentina or investigate any of the events that took place outside of the United States. Plaintiff never made the actual container or any of the seals available to Sinclair for examination. Nonetheless, after interviewing people at Kellaway warehouse, Red Hook terminal, ELMA, and examining numerous documents, Sinclair prepared a report dated February 8, 1993 (Exh. 22). In that report, Sinclair concluded

---

**5.** The "Despacho de Importacion" is a multi-paged document used by Argentine Customs Authority to record the history of cargo imported into Argentina, as it moves through customs at the Port of Buenos Aires into Argentina. The "Despacho" among other things, is where the verification of a shipment is recorded by Argentine Customs, on the reverse side of the last page, known as "partial 2," which authorizes the release of a shipment from the Port of Buenos Aires (R. 34–36, 70–73, 215–17; Exh. 2, 2A and 2B).

**6.** Although Guerrico testified at trial that he had a meeting with Mr. Biondi of ELMA on October 1st, in his deposition of May 1994, he testified that he had no meetings with anyone regarding the container between September 29 and October 2nd (R. 98). In order to explain the apparent contradiction, Guerrico stated: "It could be that I made a mistake [at the deposition], but yes I do remember having met with Captain Delatorre, Mr. Biondi and a third person, whose name I do not remember, in the ELMA building ..." (R. 100).

that: "Based on our investigation we are of the opinion that container TRIU–424632–0 was loaded with its full contents at the time it was received at the Red Hook Terminal, Brooklyn, N.Y. and that the loss occurred some time after that" (Exh. 22, p. 6).

## CONCLUSIONS OF LAW

This case involves claims by a shipper against an ocean carrier, as well as a stevedore, arising from an alleged breach of contract of carriage. The matter, therefore, falls within the court's admiralty jurisdiction. *Allied Chemical v. Companhia de Navegacao,* 775 F.2d 476, 481 (2d Cir.1985). Resolution of this suit requires the court to address three distinct problems. First, it must be determined what law is controlling with respect to the issues in this case. Plaintiff maintains that COGSA is the applicable statute, ELMA argues that the law of Argentina should govern this case, and Universal states that any claim plaintiff has against it would be governed by the New York State's bailment law. After making an initial determination, the court will apply the applicable law to plaintiff's claims against ELMA and lastly, the court will address plaintiff's claim against Universal.

## A.

■ In the first instance, the court must decide the applicable law relative to plaintiff's claims. Each party in this case asserts that a different law applies to their respective contentions. On the one hand, plaintiff argues that COGSA governs both its claim against ELMA as well as Universal; ELMA maintains that the law of Argentina is applicable to its dispute with plaintiff; and Universal, on the other hand, claims that any cause of action asserted by plaintiff would fall under New York State's law on bailments rather than Federal Maritime Law. The court will initially address what law governs plaintiff's claim against ELMA.

■ The United States Carriage of Goods by Sea Act (COGSA) applies *ex proprio vigore* (by operation of law) to "[e]very bill of lading . . . for carriage of goods by sea to or from ports of the United States." 46 U.S.C. § 1300. Neither plaintiff nor ELMA dis-

putes that COGSA applies from the time the container was loaded aboard the vessel to the time when the container was unloaded. Indeed, section 1301(e) of COGSA states: "The term 'Carriage of Goods' covers the period of time when the goods are loaded on to the time when they are discharged from the ship." 46 U.S.C. § 1301(e); *see also, Mendes Junior Intern Co. v. M/V Sokai Maru,* 43 F.3d 153, 155 (5th Cir.1995) (duty imposed under COGSA runs from the time goods are loaded onto the ship until the time that the cargo is released from port); *Metropolitan Wholesale Supply Inc. v. M/V Royal Rainbow,* 12 F.3d 58, 61 (5th Cir.1994). Consequently, COGSA does not apply of its own force to cargo which has been disembarked from a vessel, as is the situation here.

■ Ordinarily, the Harter Act (46 U.S.C. § 190 *et seq.*) applies to the delivery of off-loaded cargo to the consignee unless the parties have extended COGSA through the bill of lading. It is well-settled that parties may incorporate COGSA in their carriage agreement when it does not apply of its own terms. *Colgate Palmolive Co. v. S/S Dart Canada,* 724 F.2d 313, 315 (2d Cir.1983) ("Parties may contractually extend COGSA's application beyond its normal parameters."); *Toshiba International Corp. v. M/V Sea–Land Express,* 841 F.Supp. 123, 125 (S.D.N.Y.1994). Plaintiff argues that the bill of lading in this case provided for such an extension. The court agrees that COGSA applies.

■ "The purpose of a paramount clause [contained within a bill of lading] is to establish what law will apply to the entire contract." *Z.K. Marine, Inc. v. M/V Archigetis,* 808 F.Supp. 1561, 1565 (S.D.Fla.1992). In ELMA's bill of lading the "Clause Paramount" in pertinent part provides:

> Prior to loading on and after discharge from the ship, the goods, while in the carrier's custody, shall be at the sole risk of the shipper, consignee or owner of the goods with respect to any loss or damage howsoever caused and even though due to negligence, except if liability for any such loss or damage is to be determined in a port or place where such stipulation

against liability is invalid or unenforceable, then the provisions of said Carriage of Goods by Sea Act of the United States (except subdivision 2(j) and (q) of Section 4 thereof and except as otherwise specifically provided for herein), shall govern before the goods are loaded on and after they are discharged from the ship and throughout the entire time the goods are in the custody of the carrier and during such time the carrier shall not be liable in any capacity whatsoever for any loss or damage howsoever or wheresoever occurring other than in the management of the ship unless shown to be caused by the negligence of the carrier.

(Exh. 5). Plaintiff maintains that this clause extends the application of COGSA to the point at which the cargo was delivered to Guerrico. ELMA, on the other hand, argues that the law of Argentina is controlling from the moment the cargo was unloaded from the ship.

■ At the outset, it must be noted that the bill of lading never advances the application of the law of the port after the cargo is discharged. The Clause Paramount provides two options; first, a complete "hold harmless" exculpatory clause; or second, if that clause is invalid or unenforceable, then an application of COGSA. Thus, as a threshold matter, ELMA has not demonstrated any valid basis for the court to apply the law of Argentina. It is equally clear, that liability would be determined "in a port or place where such stipulation against liability is invalid or unenforceable" (Exh. 5, par. 2)[7]. In this case, the law of Argentina (the port in which the delivery took place) would not permit such an exculpatory clause. Dr. Carlos Lesmi, an expert on Argentina law[8] called by ELMA, advised the court "that Argentine law permits E.L.M.A. to incorporate the United States Carriage of Goods By Sea Act, to incorporate that statute as applying to the bill of lading" (R. 151). Significantly, not only did Dr. Lesmi testify that Argentine law would permit the application of COGSA, he also stated "that an Argentine court hearing a case would enforce the application of a Carriage of Goods By Sea Act in view of its incorporation into the E.L.M.A. bill of lading" (R. 151). Thus, it is clear that under the law of Argentina, COGSA would be applied as a term of the bill of lading, up until the time of delivery of the goods to plaintiff or plaintiff's representative[9]. For all of these reasons the court will apply the terms of COGSA with respect to plaintiff's claim against ELMA.

■ Universal maintains that any claim the plaintiff can assert against it rests under New York State bailment law. There is no dispute among the parties that Universal had no direct contractual relationship with plaintiff. Universal asserts that it "was only a bailee of the goods while in its possession for the purpose of performing the obligations of defendant ELMA." Universal's Post–Trial Brief, p. 5. Therefore, Universal concludes that plaintiff's only claim against it is "based upon common law bailment, under the laws of New York." *Id.* After reviewing all of the arguments, the court agrees with Universal.

■ At the outset, it is noteworthy that plaintiff fails to advance any argument relat-

---

7. It is noteworthy that ELMA does not seek to enforce the exculpatory clause.

8. The court accepted as proof of Argentine law, the testimony and affidavit of Dr. Lesmi. The Federal Rules of Civil Procedure provide that "[t]he court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." F.R.C.P. 44.1; *see also, Republic of Turkey v. OKS Partners,* 146 F.R.D. 24, 27 (D.Mass.1993); *United States v. Pre–Columbian Artifacts,* 845 F.Supp. 544, 546 (N.D.Ill.1993); C.A. Wright & A. Miller, *Federal Practice & Procedure* § 2444 at 406 (1971).

9. Of course, the United States would not enforce the exculpatory clause in the bill of lading. As previously mentioned, the Harter Act would ordinarily apply to post-discharge handling of cargo until such time as the cargo was delivered to the consignee. While an extension of the provisions of COGSA would be permitted to supplant the Harter Act, a party may not avoid liability simply by including a clause in the bill of lading absolving that party of all liability under all circumstances. *See* 46 U.S.C. § 1302. Therefore, any such clause would be unenforceable in either the United States or Argentina.

·ing to the legal theory under which it seeks to hold Universal liable. Despite Universal's strong argument as to why New York bailment law should apply, plaintiff has offered no objection or counter view. Accordingly, the court assumes that plaintiff has acquiesced to Universal's position. *See, Teh-ran–Berkeley Civil & Envtl. Engineers v. Tippetts et al.,* 888 F.2d 239, 242 (2d Cir. 1989); *Tokio Marine Management Inc. v. M/V Zim· Tokyo,* 1993 WL 322869, n. 9 (S.D.N.Y.1993). Nonetheless, the court has independently determined that New York law governing bailments should apply. It is well settled that "an action against a terminal for negligent loss of cargo is not within federal maritime jurisdiction, but is a state claim governed by state law." *Colgate Palmolive Co. v. S/S Dart Canada,* 724 F.2d 313, 315 (2d Cir.1983); *Leather's Best, Inc. v. S.S. Mormaclynx,* 451 F.2d 800, 808–09 (2d Cir. 1971); *Tokio Marine,* 1993 WL 322869, *5; *Minemet, Inc. v. M.V. Mormacdraco,* 536 F.Supp. 769, 771 (S.D.N.Y.), *aff'd,* 714 F.2d 115 (2d Cir.1982). Since Universal acted as ELMA's stevedore and was a bailee of the goods while in its possession at the New York terminal, the court finds that plaintiff's claim is based upon New York State principles of bailment.

 Despite the non-federal nature of plaintiff's cause of action against Universal, since the state claim is interwoven with plaintiff's federal action against ELMA, the court maintains supplemental jurisdiction over plaintiff's allegations against Universal. 28 U.S.C. 1367(a) [10]; *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966) (federal courts may exercise pendant jurisdiction if the state and federal claims "derive from a common nucleus of operative fact"). In deciding plaintiff's action against Universal, the court will apply New York substantive law in the same manner as would a New York State court. *Erie*

*Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Having established the applicable law governing each claim, the court now turns to plaintiff's allegations against ELMA.

## B.

 Plaintiff insists that ELMA is liable for the loss of cargo under COGSA. In order for a party to enforce its rights under COGSA, "litigants must engage in the ping-pong game of burden shifting mandated by sections 1303 and 1304 of the Act." *Tubacex Inc. v. M/V Risan,* 45 F.3d 951, 954 (5th Cir.1995). The first burden falls on the plaintiff shipper, who must establish a *prima facie* case of loss. This burden is satisfied if the shipper can demonstrate delivery of the cargo in good condition to the carrier *and* either the arrival of less cargo than was loaded or delivery of the goods in damaged condition. *See* 46 U.S.C. §§ 1303(3) and 1304; *see also, Thyssen, Inc. v. S/S Eurouni-ty,* 21 F.3d 533, 538 (2d Cir.1994); *New York Marine & Gen. v. S/S Ming Prosperity,* 920 F.Supp. 416, 422 (S.D.N.Y.1996); *Ferrostaal Corp. v. M.V. Singa Wilguard,* 838 F.Supp. 757, 767 (S.D.N.Y.1993). If both prongs of the *prima facie* case have been established, the burden then shifts to the carrier to show that any loss falls within one of COGSA's exceptions. *Westway Coffee Corp. v. M.V. Netuno,* 675 F.2d 30, 32 (2d Cir.1982); *Judy—Philippine Inc. v. S/S Verazano Bridge,* 781 F.Supp. 253, 258 (S.D.N.Y.1991). To establish a *prima facie* case, the shipper must adduce evidence that, standing alone, establishes both prongs of the claim. The court finds that plaintiff has failed to establish a *prima facie* case.

 This circuit has made clear that the bill of lading, alone, is not sufficient proof of the number of cartons within a sealed container "because that aspect of the cargo was not ascertainable from any external ex-

**10.** The court's ability to grant supplemental jurisdiction is as follows:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction

> over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C. § 1367(a).

amination of the containers." *Bally, Inc. v. M.V. Zim America,* 22 F.3d 65, 69 (2d Cir. 1994). In this case, however, plaintiff has submitted additional evidence which the court finds sufficiently sustains plaintiff's burden. First, there was the testimony of Stanford, whom the court found entirely credible. Stanford stated that he had observed the placement of 736 cartons of shoes in the container (R. 264–65). In addition, the deposition testimony of Edward St. John, Frederick Carter, and Philip A. Puopolo, all corroborate the amount of cartons claimed by plaintiff (Exhs. 70, 71; Universal Exh. CC). Thus, plaintiff has satisfactorily established the delivery of the goods in good condition to ELMA.

 Demonstrating damaged cargo at outturn is more problematic. In order to establish the second prong, plaintiff must demonstrate that any loss or damage occurred *before* the cargo was returned to its possession. Here, plaintiff has failed to do so. Accepting Guerrico's recounting of the events to be entirely accurate, it is clear that he received possession of the container between 2:00 and 2:30 p.m., on September 29th. Based on Guerrico's testimony, the earliest he opened the container was approximately 4:00 p.m., that same day. Guerrico admitted that he did not personally accompany the container during that entire time period. Initially, he rode to Pier A from Pier D separate from the container. Then later, at Pier D, Guerrico went inside to speak to Diaz, the verifier, where by his own calculation he had to wait between 15 to 30 minutes

before he was able to speak to Diaz. Accordingly, the only witness presented by plaintiff who offered first-hand testimony describing the opening of the container, by his own admission, was away from the container for at least 45 minutes. Although Guerrico named several people, including the truck driver and armed guards who were with the container from the time of receipt until the time the loss was discovered, plaintiff did not call any of these individuals to the stand, nor was any deposition testimony offered into evidence [11]. Accordingly, the court must base its decision solely on Guerrico's testimony, which is the only evidence presented by plaintiff regarding the occurrences which took place in Argentina.

 Much has been made regarding the credibility of Guerrico. While there is no doubt that Guerrico was not completely forthcoming at the deposition, the court believes that at trial Guerrico attempted to relay the facts as accurately as his memory permitted. Guerrico fully explained why he had not been truthful regarding the presence of Diaz, and after observing his manner and listening to his testimony, the court believes that Guerrico, credibly, was testifying to the best of his recollection. Nonetheless, Guerrico's testimony constituted the *only* evidence of the discovery of the loss. Even assuming the accuracy of Guerrico's testimony, many of the important aspects of what happened to the container once it was in Guerrico's custody are nebulous. Reviewing the evidence, the court cannot ignore the fact that there is

---

11. ELMA points out in its post-trial brief that:
 Significantly, a number of witnesses were not called to testify, either live or by deposition, who could have verified Mr. Guerrico's story, including the guards allegedly with the container; the driver of the truck; Mr. Fernandez, the Customs official at Area D; Mr. Delgado, Mr. Fernandez's boss; the person who cut the seals; Mr. Ramos of the office of Edwardo Manuel Marquez, R.B.K.'s insurance investigators; or anyone else from Marquez's office or from R.B.K.'s underwriter. The Court should draw a negative inference from R.B.K.'s failure to produce any of these witnesses to support Mr. Guerrico's story. The negative inference is that if these witnesses were invited to testify they would neither provide helpful information to support R.B.K.'s position nor would their testimony support Mr. Guerrico's story.

ELMA's Post–Trial Brief, p. 7. Plaintiff's only response is its statement that there should be no negative inference drawn "since each of these persons is equally available to ELMA, none of whom is an employee of RBK." Plaintiff's Reply Brief, p. 8. Of course, plaintiff's response ignores the fact that plaintiff, not defendant, is charged with establishing a *prima facie* case under COGSA. The court is puzzled by plaintiff's failure to call or offer any corroborating evidence to support Guerrico's testimony, or more importantly, fill in the time gaps. Nonetheless, there is no occasion to reach the issue of a negative inference because the gaps in time as well as other problems with plaintiff's attempt to meet its burden would preclude a judgment for plaintiff whether a negative inference was taken or not.

a significant period of unaccounted-for time before the loss was discovered, but while the container was in the possession of plaintiff. In order for plaintiff to successfully establish a *prima facie* case that the goods were returned damaged or missing, the evidence must rule out the possibility that the goods were not pilfered while in plaintiff's custody. *Bally*, 22 F.3d at 69. Here, because there exists a period of time during which Guerrico is unable to account for the welfare of the container, plaintiff did not eliminate the possibility that the goods were not lost or stolen while in its custody. Since the goods may have been tampered with during the time when Guerrico was not present, and plaintiff has failed to present evidence from a person with any knowledge of the safety of the container during the time when Guerrico was not present, the court is constrained to find that plaintiff has failed to establish its *prima facie* case.

Nor does the testimony of plaintiff's cargo surveyor, David Sinclair, help plaintiff establish its case. Indeed, nothing in his report or testimony can shed any light on what actually happened to the container from the time that plaintiff received the cargo to the time when the loss was discovered. Sinclair, himself, stated that he was not asked to go to Argentina to investigate what had happened in Buenos Aires and that he relied upon second hand information (some of which was inaccurate) as to all aspects of the events in Argentina. In his report Sinclair concluded: "Based on our investigation, we are of the opinion that container TRIU424632–0 was loaded with full contents at the time it was received at the Red Hook Terminal, Brooklyn, New York and that the loss occurred sometime after that" (Exh. 22). This conclusion fails to rule out the possibility that the loss occurred after Guerrico received the container. Similarly, at trial Sinclair stated:

> Basically all I can say, sir, is that the weight that was in the container at the time it was received at Red Hook showed that the full contents were in it at the time. When the container was received by Mr. Guerrico in Argentina and opened, it was found to have a shortage. And so basically all I can say is that it happened sometime

between those two points. I can't tell you where it happened, I just don't know.

(R. 333–34). Moreover, Sinclair based all of his conclusions as to what happened in Argentina, on the testimony of Guerrico. Sinclair did not corroborate any of the information he received. Accordingly, since Sinclair cannot fill any of the gaps in time during which the container was in possession of plaintiff, and considering that Guerrico was not with the container for the entire period, the court finds that Sinclair's report fails to establish *prima facie* evidence that the loss occurred before outturn of the cargo.

█ Finally, the evidence supports ELMA's claim that the loss did not occur while the container within its custody and control. Although the Second Circuit has stated that "delivery by a carrier of a container with an intact seal does not conclusively prove that the loss did not occur while the container was in the carrier's possession," that court nonetheless found that when "there was no evidence that the container had been tampered with, and [plaintiff] does not suggest that the high-security seal had been breached," that "there was insufficient evidence for the district court to conclude that the cartons were missing from the sealed container when it was delivered by [defendant] at the Maher Terminal." *Bally*, 22 F.3d at 70; *see also, Roco Carriers, Ltd. v. M/V Nurnberg Express*, 1990 WL 270422 (S.D.N.Y.1990), *aff'd*, 899 F.2d 1292 (2d Cir. 1990) (fact that the seals were intact on the container demonstrates carrier was free from negligence); *Cf. Leather's Best v. M.V. Lloyd Sergipe*, 760 F.Supp. 301, 306–307 (S.D.N.Y. 1991) (holding carrier liable even though it delivered sealed container where seal was frail and rusted and container was damaged); *Westway Coffee Corp. v. M.V. Netuno*, 528 F.Supp. 113, 115 (S.D.N.Y.1981) (District Court concluding that unnumbered fragile seals easily could have been removed and duplicated). Here, there were three metal, numbered, and intact seals on the container when it was delivered to plaintiff. The only witness offered as to the receipt of the container, testified that there was no evidence to suggest that the seals had been tampered with.

■ While recognizing Sinclair's testimony regarding the ability of thieves to steal cargo from a container while the seals were intact, the court finds it of little weight as applied to the particulars of this case. Undoubtedly there are several ways goods can be stolen from a sealed container, without disturbing the seals. However, mere theoretical possibilities may not be substituted for evidence. In this case, Sinclair specifically admitted that he had never inspected the container and that when he asked to inspect the seals he "was told they had been discarded" (R. 349, 352). Thus, while the court has no doubt as to Sinclair's expertise and accuracy regarding the opening of a container without disturbing the seals, the fact is that Sinclair never examined the particular container involved in this case, and therefore, could not conclude that any of those practices were used in this case.

Indeed, Guerrico, who testified that he had inspected the container "to make sure that it was in sound condition," specifically stated that there were no holes in the container, the doors functioned, they were not hanging, there were no freshly-welded spots inside the container, and that he "didn't see anything out of the ordinary" (R. 126). Therefore, the only evidence presented to the court was that the seals were at all times intact and that there was no indication of anyone tampering with the container. Significantly too, while onboard ELMA's vessel the container was stored approximately forty feet above the ground in the hold. In such position, it would be very unlikely that anyone would have easy access to the container, much less be able to pilfer cargo. Such evidence strongly militates against plaintiff's claim that the goods were lost while in ELMA's custody. *Bally* 22 F.3d at 70.

Consequently, taking together all of the problems with plaintiff's proof, the only conclusion that the court can reach is that there was insufficient evidence to support a finding that the 498 cartons of sport shoes were missing at outturn. Therefore, plaintiff has failed to established its *prima facie* case as required by COGSA and the claim against defendant ELMA must be dismissed. *See, Bally,* 22 F.3d at 71 (failure of plaintiff to prove the second prong of its *prima facie* case under COGSA required dismissal of the claim).

## C.

■ Plaintiff's post-trial briefs do not contain a theory of liability against Universal and concentrate solely on ELMA. However, any conceivable claim brought by plaintiff against Universal would fall under New York State bailment law. Under New York law, a bailor is entitled to a rebuttable inference of negligence against a bailee, provided that the bailor can establish "delivery of the stored property to the warehouse and its [the bailee's] failure to return that property upon proper demand." *I.C.C. Metals, Inc. v. Municipal Warehouse Co.,* 50 N.Y.2d 657, 660, 431 N.Y.S.2d 372, 409 N.E.2d 849 (1980); *Art Masters Associates Ltd. v. UPS,* 153 A.D.2d 41, 549 N.Y.S.2d 495, 499 (1989); *RGA Industries v. Jomas Express,* 129 Misc.2d 1066, 499 N.Y.S.2d 28, 28–29 (App.Term 1st Dept. 1985); *Leather's Best Inc. v. S.S. Mormaclynx,* 451 F.2d 800, 813 (2d Cir.1971) (applying New York law). The inference of negligence may be rebutted if the bailee can explain what happened to the goods, at which point the burden falls back upon the bailor to establish the bailee's negligence. *I.C.C. Metals, Inc.,* 50 N.Y.2d at 660, 431 N.Y.S.2d 372, 409 N.E.2d 849; *Procter & Gamble Distributing Company v. Lawrence American Field Warehousing Corp.,* 16 N.Y.2d 344, 266 N.Y.S.2d 785, 213 N.E.2d 873 (1965). Here, plaintiff has failed to establish that it was Universal who returned the container with goods missing.

There is no question, based upon the weighing of the container when it arrived at Universal's terminal, that Universal received the goods in good condition. This alone does not satisfy plaintiff's burden. Under the law of New York, plaintiff must demonstrate that it was Universal who failed to return the goods in the same condition as they were received. Plaintiff's surveyor, Sinclair did not establish when the goods were taken and neither plaintiff nor ELMA advanced any evidence of tampering occurring at Universal's Red Hook facility. Importantly, ELMA

retrieved the container from Universal without incident.

Hence, for all of the reasons which have been previously discussed, plaintiff failed to eliminate the possibility that the cargo was stolen while it was in possession of the container in Argentina. Although the specter of possibility remains that the shoes were stolen while in Universal's custody, there is not one shred of evidence which supports such a theory. Indeed, mere "surmise and conjecture" is insufficient to fulfill plaintiff's burden. *Minemet Inc. v. M.V. Mormacdraco,* 536 F.Supp. at 775 (applying New York law). In short, while plaintiff has failed to set forth sufficient evidence to establish a *prima facie* case against ELMA under COGSA, it has not offered *any* evidence which would indicate Universal was responsible for the loss. Therefore, plaintiff's claim against Universal must fail.

Finally, even if the court were to accept plaintiff's assertion that the goods were lost sometime after Universal received the container and before plaintiff regained possession of it in Argentina, there would still be no liability against Universal. In absence of proof of where the loss took place, there is a presumption that it occurred with the last carrier. *Madow Co. v. S.S. Liberty Exporter,* 569 F.2d 1183, 1185 (2d Cir.1978). As an intermediary bailor of the container, Universal cannot be held liable for any cargo loss when there is no evidence establishing when and where the loss took place. Therefore, plaintiff's claim against Universal must be dismissed.

Since the court's findings reject plaintiff's claims against both ELMA and Universal, there is no occasion to address the issue of damages.

## CONCLUSION

With regard to Plaintiff's action against defendants ELMA and Universal, the court finds that plaintiff failed to establish the required *prima facie* case against ELMA as required by COGSA or meet its burden of proof against Universal as provided for under New York law. Accordingly, plaintiff's

claims against ELMA and Universal are hereby dismissed.

Each side shall bear its own cost.

The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**